SWEEZO *v.* CHEBOYGAN ELECTRIC LIGHT & POWER CO.

1. EVIDENCE—JUDICIAL NOTICE — ELECTRICITY — COMMON KNOWLEDGE.

   The court will take judicial notice that it is a matter of general knowledge that electric wires of high voltage, even if insulated, are dangerous.

2. MASTER AND SERVANT—CONTRIBUTORY NEGLIGENCE—ELECTRICITY.

   It was contributory negligence for an employé in a power station, in looking for a lost rubber ball that had fallen into a pit where there were wires of high voltage, which he had notice not to touch because they were dangerous, to lower a lighted lantern among the wires in the performance of no requirement of, or duty to, his employer.

Error to Cheboygan; Shepherd, J. Submitted April 14, 1911. (Docket No. 38.) Decided May 8, 1911.

Case by Elizabeth Sweezo, administratrix of the estate of Augustus Sweezo, deceased, for the negligent killing of intestate. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*C. S. Reilley*, for appellant.

*Frost & Sprague* (*Hall, De Foe & Henry*, of counsel), for appellee.

HOOKER, J.   The plaintiff, a widow, has brought this action to recover damages for the loss of her husband, who was an employé of the defendant, in charge of its electric generating station, at the time of his death.

In this station were two generating machines.   He was killed by the electric current from No. 2, and No. 1 has nothing of importance to do with the case.   The generating wheel of the machine was nearly 10 feet in diameter. It was supported upon journals in which its shaft lay and turned; the shaft being run by a water wheel some 30 or more feet distant.   The journals were supported on standards of iron extending 3½ feet above the floor of the power house.   They stood on top of the iron base, and that on the right end of the machine was about six feet distant from the generator.   As we understand the record, the wheel extends below the floor into a pit about 28 inches deep and 6 by 8 feet in size, approximately.   As near as we can understand from the record, the iron base upon which the standards rest lies upon the floor or ground beneath it, and surrounds the pit, forming a barrier 9 inches thick and a foot high above the floor.   It is 40 inches from the top of the base to the bottom of the pit.   This base is grounded and devoid of danger through contact with it. The current is taken from the armature which surrounds the whole wheel upon three wires down in the pit, and conducted under the floor, to the switchboard.   These wires were insulated and carried a current of high voltage.   The distance from the side of the wheel to the side of the pit is two feet.

The negligence alleged is a failure to properly insulate and inspect the three wires in the pit and omission to properly warn deceased of their danger.   The plaintiff's husband was a man who had previously worked at railroading and in a sawmill six summers.   In the fire hold

of the mill was the dynamo which furnished electricity for the sawmill, and at noon he had been in the habit of going there to smoke. He was employed and began work on April 1, 1908, as night man, taking the place of one Willsey, who was advanced. He was killed on the night of July 7th following his employment, under the following circumstances: On July 6th his two children were playing with a rubber ball in the power house, and it fell into the pit of No. 2 generator. The plaintiff was present, and testified upon the trial that the "girl asked deceased to get the ball the next time the machine was not running," and he replied "there, let it be—you can't get it, nor I can't get it. I will have to tell Mr. Willsey to get it." The generator ran all night and the ball remained there. The next night the girl asked him again if he would tell Mr. Willsey to get the ball, and he said that he would. The plaintiff's own testimony of what followed is inserted:

"Just then he raised up and marked on this paper, and the telephone bell rang at the same time. I, not knowing what the meaning of the telephone rings was—whether it was for the plant, or on the line—I didn't pay any attention to it; and he just dropped his pencil as soon as he marked, and started back as if he was going to the telephone office. * * * I listened, and I didn't hear him receive the message, and pretty soon he came out, and the next thing I was seeing—of course, the next thing that brought my attention was him striking a match on the stove. I looked up, and he had the lantern. It is a lantern the same as that one there.

"*Q.* The same as this lantern here?

"*A.* Yes, sir, it was, only it looked as if it was larger, to me, in the globe, and he had hold of the handle, just like that, and he lit the lantern. And I never seen him take it out of that position—but he started over. When he lit the lantern, I said, 'Why, papa, what are you going to do with the lantern?' He says, 'I am going to see if I can see Laura's ball.' I says, 'If you are going to look, I am going to look, too,' and I just let my sewing drop on the floor and started right after him; and he made off as if he was going to the end of this—

"*Q.* Pit?

"*A.* Is that what you call it?

"*Q.* Yes; now which end? Next to the switchboard?

"*A.* Next to the switchboard. He looked as if he was going there. Instead of that, he turned and kind of stepped back to the rounding corner, and he just kind of stooped over—I couldn't say whether he let the lantern go down this way, or whether he still held it in his hand. I never seen him change it; but, as soon as he stooped over in that position, there was two lights lit up and it all sparkled two spark lights; and, of course, it excited me so that I didn't know what to do.

"*Q.* Now what happened to him?

"*A.* He commenced to shake, and I supposed that he was going to pitch forward, and he settled down onto this basin or this iron base; and I grabbed him right under his arms, and I laid him back onto the floor. * * * When Mr. Sweezo was standing at the side of me, when he left the stove, he had the lantern in his left hand. It did not look to me as though his body touched the base, but I do not know. After the light flashed, I could not say whether his body touched the base or not. He was pretty close to the base, and was bending over quite a little bit. I was close to the base, but did not feel any shock. * * * He was at the rounding corner of the base when he looked into the pit. He held the lantern down into the pit. I was so scared I didn't say anything. I did not even see the wheel. I was not scared before he let the lantern down in the pit. I saw the flash of fire. My husband said nothing after that."

The daughter, a girl eight or nine years old at the time of the accident, testified:

" I remember when my father was killed. I was down to the plant that night. The first thing I said I asked him if he would get my ball, or ask Mr. Willsey to get my ball for me. He was sitting in the chair by the meter board. I was over by Charley by the meter board. When I asked him if he would ask Mr. Willsey if he would get the ball, he said he would ask Mr. Willsey. I heard my mamma when she asked him what he was going to do with the lantern, and he said he was going to see if he could see my ball. I went over near the pit to look for the ball. I was around on the other side from where my father was; the other side of the big shaft. I know where

the standard comes up, and I was standing at the extreme end. The standard was between me and my father. I looked in the pit. It was dark down there—could not see much of anything. We used to play at the plant in the evening, and Mr. Willsey's children also."

Cross-examination by Mr. Reilley:

" I wanted my father to get my ball on Monday night—that was the night I lost it. And asked him for it, and remember him saying he could not get it—he would have to have Mr. Willsey get it. He was going to have him get it on Tuesday morning but he forgot. I did not want him to get it because I thought he could not get it when the machine was running. I knew the machines made the electricity. I thought the only time to get the ball was when the machine was not running—that would be in the daytime."

Upon the subject of warning, Harry DePuy, defendant's bookkeeper, testified to the hiring of deceased by Mr. Spencer, defendant's superintendent, and that Spencer told him—

"About being careful about coming in contact with any wires or anything like that; and I also heard Mr. Sweezo make the remark that he didn't think the place up there could be any more dangerous than the one that he had then. * * *

" *Q.* State the conversation in reference to the employment between Mr. Sweezo and Mr. Spencer.

"*A.* Why, Mr. Spencer told him that he was going into a very dangerous place there—that he would have to be constantly on his guard.

" *Q.* Now you say that he told him to be careful about contact with wires ?

"*A.* Yes, sir.

" *Q.* What else, if you remember, did he say in reference to that subject to Mr. Sweezo ?

"*A.* He told him not to—any wires—not to come in contact with any wires whatever."

Mr. Willsey testified:

"When Mr. Sweezo was first employed, I was over there with him 14 nights. My employment at that time was taking care of the generator in the daytime, and look-

ing after the switchboard and machinery, and also the water. During the first three or four weeks I left him alone an accident happened. I was there shortly after. At one time, the coils in No. 1 machine got grounded with the case, and it caused the current transformers to break down and the current going from one to the other. It caused a fire. Mr. Sweezo was there at that time. When I went into the power house, he was carrying water in a drinking cup and throwing it onto this fire. I went down and pulled out a switch—killed the machine. It cut off the current, stopped it generating; and we put out the fire. Mrs. Sweezo was there and my wife, also a young lady who taught school up there, and I believe Mr. Sweezo's oldest son.

"*Q.* What did you say to Mr. Sweezo, if anything?

"*A.* Why, Mr. Sweezo seemed to feel very bad, thinking it happened the first time I had left the plant, and I told him it wasn't any fault of his—that he shouldn't feel any ways like that about it, and he told me that if we would keep a pail around there that he could get some water, and he could have prevented the fire burning so; and I told him then, I says: 'It is a lucky thing, Mr. Sweezo, that you didn't use the pail.' I says: 'There is a pail there in the adjoining room.' I said: 'It is a lucky thing, Mr. Sweezo, that you didn't use the pail, because if you had taken that pail and throwed water onto that fire, as you call it, you wouldn't have known what happened you.' I said: 'You might just as well take your bare hand and catch right hold of those wires as to throw water onto it by the pailful.'

"*Q.* Catch hold of what wires?

"*A.* Those wires that he was throwing water onto.

"*Q.* What wires were they?

"*A.* They was the lead wires from this generator, which I pointed out to him. I says: 'Those wires there are the same ones that comes out, or that you see there in that pit.'

"*Q.* That is the pit where he was hurt?

"*A.* No, sir; in No. 1 machine.

"*Q.* What did he say, if anything?

"*A.* I don't know as he said anything."

Here was a direct reference to these wires in the pit and the extreme danger of contact with them.

"*Q.* What, if anything, was the occasion and what

was said in reference to those wires in pit No. 2 by you to Mr. Sweezo?

"*A.* Why, I remember one night we were standing there and talking about it, and I was showing him the wires, and I told him that everything on the back of the switchboard, as we stood by it, was of high voltage, the same as those lead wires that comes from this machine, that run through this pit No. 2.

" *Q.* Was anything said about coming in contact with the wires?    *    *    *

"*A.* Why, I don't know as there was, only I just told him that those were the same wires that he saw at the switchboard as he saw in the pit.

" *Q.* At that time, or any of these times when you had a talk with him in reference to those wires—you say it was on more than one occasion—what was said by you to him, if anything, about the base—as to its construction, and if it ran to the ground, or anything of that kind?

"*A.* Why, I told him that the base was connected with the earth purposely, so that if those coils had grounded with the case of the machine that he could not get hurt off from it.

"*Q.* What do you mean by the coils? Now, explain that just as nearly as you can to the jury—the coils being grounded with the case of the machine.

"*A.* Well, those coils—what we call armature coils—is the coils of wire that is in the frame of this big machine, as it is shown here in this picture. There is coils of wire here that is in this big cast iron case here, and they are insulated and sometimes they break down. I mean they get grounded with this iron, and by that way, why, we ground it, connect it with the earth, so that a person can't get hurt from the outside of this machine. You see this sheet here—there is what we call the 'armature coils'— coils of wire around inside of that casing; and sometimes we have what we call a breakdown. The current burns through the insulation and causes an arc, or jumps through this case, grounds it, and we take the base and ground it with the earth so that nobody can get hurt on it.

"*Q.* Now, when Mr. Sweezo first came there, during the first 14 nights that you was there, was there any talk between you and him in reference to contact with the wires there?

"*A.* Why, I talked with him—    *    *    *    I talked with Mr. Sweezo about the wires; yes, sir.

"*Q*. Now, I want you to go ahead and tell the jury just what you said.

"*A*. Well, I cautioned Mr. Sweezo. I told him the voltage of the machine, what it generated, and what the wires was, and where the wires was that carried this voltage from this machine.

"*Q*. Now, I want you to tell the jury just the same as you told him. You say you told him the amount of voltage. Now, I want you to say what you told him. Go ahead and tell the jury just what you told him.

"*A*. Why, I don't know as I called him 'Mr. Sweezo,' but it don't make any difference. I called him 'Gus'— that was his first name. 'Now' (I says) 'Gus, this generator, or those generators, generates 11,500 volts at any time, and those wires leading from this machine carries this voltage.'

"*Q*. What wires were you talking about?

"*A*. Those lead wires from the machine that run through this pit. And I don't remember just what all I did say; but I remember telling him that.

"*Q*. Now, then, in reference, if you said anything about the contact with those wires, that is what I want you to say. I want you to tell what you said to him.

"*A*. Well, I told him that they were very dangerous— never to go near them—that his business didn't call him there, and not to do anything around that machine when it was running; that is, in the way of any more than his duty, feeling of those bearings and such as his duties were. He understood what his duties was.

"*Q*. Well, was there anything that called him in the pit or the handling of those wires that you had been telling him about?

"*A*. No, sir.

"*Q*. Now, after he had been there some time, in reference to his handling the machines or not doing anything about the machines, did you ever have any talk with him along that line?

"*A*. I did.

"*Q*. Tell the jury what it was.

"*A*. I told him to be very careful around this machine when it was running—not to do any cleaning around it— and also the governor, for fear that he would get something in the governor that would cause him some trouble, to let the cleaning go, that we could clean it when we shut it down, if we did, which we did occasionally. I

used to caution Mr. Sweezo when I would leave there in the evening and say to him that, if anything happened he could not stop, to take his hat and walk out and call me—to take no chances. When I first went over to the power house after the accident, the lights were off, but I turned them on. I turned them on by putting in the switch of the switchboard. The switch was pulled out. When I turned on the lights, the cluster of lights and also the lights over the exciter and governor lit. If the lights had not been on before the accident, they would not have lit up as they did. The lights were turned off on the 7th of July, 35 minutes after 8, and were out in the neighborhood of 20 minutes. I got that from a machine that registered time at the office here."

It also appeared that signs with the words "Dangerous" and "Hands Off" upon them were conspicuously posted in the vicinity of the wires and generator, and that the wires in the pit were readily discernible (though this last was disputed), and were identical with the wires at the switchboard.

**Want of Proper Insulation.** We infer from the testimony and the conduct of the case that counsel agree that the shock that killed plaintiff's husband was caused by his lantern coming in contact with one or more of the lead wires in the pit when he lowered it to look for the ball. Counsel for plaintiff seem to claim that such contact would have been harmless had there been proper insulation upon the wires. There is a paucity of evidence upon that subject, if there is any that indicates that it is usual or feasible to have such lead wires so insulated as to prevent grounding through any insulation in common use. One witness testified that from his experience he was of the opinion that there would be great danger in such contact, where the man was well grounded, as deceased evidently was if he was in touch with the base.

A critical examination of the record impels us to say that it conclusively shows that the deceased knew of the presence of the lead wires in the pit; that the same wires went to the switchboard; that they carried a dangerously

165 Mich.—8.

high voltage; and that he had been warned not to touch them either in or out of the pit, and that his duty did not call him to invade the pit in any way at any time, or to touch the machine except to oil the journals, when it was running. It is manifest that not only did the deceased understand the necessity of caution in all of these things, but even his wife and children were alive to it. Moreover, we may take judicial notice that it is a matter of general knowledge that electric wires of high voltage, even if insulated, are dangerous, and to be avoided.

We are aware that in all probability the deceased thought he could avoid contact with these wires, but he took the risk of that when he lowered his lantern into the pit where he knew the dangerous wires were, and he was negligent in so doing. He evidently did it against his own better judgment, which had led him to say that he could not get the ball, but Willsey would have to get it, and the girl to understand that it could be recovered only when the machine should not be running.

Beyond all of this is the further point that deceased was not acting in the line of his duty, and did not suppose he was. His duties were clearly stated by plaintiff's own witness, Monroe. This was a most tragic affair, and appeals strongly to our sympathies, as it evidently did to those of the jury, but neither courts nor juries have any right to bestow charity at the expense of litigants who are under no legal obligations to compensate the unfortunate for their misfortunes.

We feel constrained to reverse the judgment. No new trial is ordered.

OSTRANDER, C. J., and BIRD, BLAIR, and STONE, JJ., concurred.